IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

LOGAN STORM,

               Defendant.

Case No.: **3:11-cr-00373-SI**

**OPINION AND ORDER**

S. Amanda Marshall
United States Attorney, District of Oregon
Jane H. Shoemaker
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
      Attorneys for Plaintiff

Gerald M. Needham
Amy Baggio
Assistant Federal Public Defenders
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
      Attorneys for Defendant

**SIMON, District Judge.**

      Defendant Logan Storm ("Defendant" or "Storm") is charged with knowing possession

of images of child pornography, defined in 18 U.S.C. § 2256(8) as the "visual depiction . . . of a

minor engaging in sexually explicit conduct," in violation of 18 U.S.C. § 2252(a)(5)(B).  On

OPINION AND ORDER – PAGE 1

April 19, 2012, Storm filed four pretrial motions: a Motion to Suppress Defendant's Statements (Doc. No. 22); a Motion to Dismiss Indictment for Violation of Double Jeopardy Clause of the Fifth Amendment to the United States Constitution (Doc. No. 23); a Motion to Suppress and for *Franks* Hearing (Doc. No. 24); and a Motion to Suppress Evidence Obtained from General Warrants (Doc. No. 25). Defendant's four motions are DENIED.

## FACTUAL BACKGROUND

In July 2010, Storm was living with his then-girlfriend, Amy Anderton; his minor son; and a male roommate, Michael Neilsen. Anderton contacted the police in late July, stating that she had found sexually explicit images of children on Storm's computer and on his "thumb drive," an electronic media storage device also known as a "flash drive." When Detective Tim Snider of the Portland Police Bureau interviewed Anderton on July 25, 2010, she told him that she had seen the images on Storm's white MacBook laptop in the "recently viewed" files. She also reported seeing PowerPoint files containing additional and similar images that she had found on a black thumb drive with a red logo located inside of a brown cardboard jewelry box in Storm's bedroom. She had shown the images to Neilsen, who advised her to call the police; Neilsen also spoke to the police and corroborated Anderton's statements. Def. Ex. 16 (Doc. No. 26-18) at 2-4.

Based on this information, Detective Snider prepared an affidavit the same day in support of a warrant to search Storm's residence and seize:

- A white Macintosh laptop computer belonging to Mr. Logan Storm;

- Any device capable of creating, storing, or viewing electronic date [sic], including without limitation computers, cellular telephones, personal data assistances, CDs and DVDs, and other electronic storage media;

- Any and all sexually explicit or suggestive material including but not limited to photographs, magazines, motion pictures, videotapes, books, drawings,

OPINION AND ORDER – PAGE 2

and/or other visual media;

- Any and all documentation regarding the abuse of children such as, but not limited to, videos, recordings, photographs, drawings, and/or written words;

- Information describing the contents or usage of electronic media, including without limitation directory information, file names, Internet history, cache files, etc.;

- Evidence of communications related to the sexual exploitation of children;

- Evidence of creation, storage, and transfer of illicit images; and

- Documentation to establish identification such as, but limited to [sic], letters, bills, rent receipts, checks, driver's licenses or identification, tax records, personal bank or credit card records, credit cards, utility bills, notes, and/or letters.

Def. Ex. 7 (Doc. No. 26-7) at 8-9. At 12:24 a.m. on July 26, 2010, Multnomah County Circuit Court Judge Kelly Skye authorized the warrant and granted night service. Def. Ex. 16 at 4. The warrant contained a copy of the list described above and identified Storm's residence. The warrant did not incorporate the affidavit or refer to the statute allegedly violated, although the affidavit referred to the relevant statute. Def. Ex. 7 at 10-11.

Detective Snider, other detectives from the Multnomah County Child Abuse team, and other police officers executed the search warrant at Storm's residence in the early morning hours of July 26, 2010. Neilsen answered the door and directed Detective Snider to Storm's bedroom. Detective Snider knocked on Storm's bedroom door. When Storm emerged, Detective Snider identified himself as a police officer and informed Storm that he had a search warrant for the house. Def. Ex. 16 at 4. The precise sequence of events during the execution of the warrant is in dispute, and during an evidentiary hearing held on the pending motions, this Court found the testimony of both Detective Snider and Storm to be credible, notwithstanding an occasional conflict in their recollection of events. Mot. Hr'g (Doc. No. 47) at 148. For the purposes of this

opinion, the Court adopts the order of events to which Storm testified during the evidentiary hearing.

After Storm got dressed, Detective Snider escorted him to the living room, served him with the search warrant, and read him his *Miranda* rights. *Id.* at 105-106. According to Detective Snider, Storm seemed unfocused, looking around the room and appearing very nervous. Def. Ex. 16 at 4. When asked if he understood his rights, Storm paused for a few seconds before asking for them to be read again. *Id.* at 4-5; Mot. Hr'g at 109. Detective Snider re-read each right individually and confirmed that Storm had understood it before continuing. Def. Ex. 16 at 5; Mot. Hr'g at 109.

Detective Snider informed Storm of the allegation of possession of child pornography. When Detective Snider began asking Storm questions about that topic, Storm invoked his *Miranda* rights. Def. Ex. 16 at 5; Mot. Hr'g at 113-115. Detective Snider then ended the interview, but later again spoke with Storm to arrange for someone to pick up Storm's minor son who was living at Storm's home. Mot. Hr'g at 123.

At some point later that evening, Detective Snider and Storm discussed where his laptop was located in the house and how his laptop could be distinguished from his son's computer. *Id.* at 126; Def. Ex. 16 at 5. After the search was completed, Detective Snider gave Storm a written property receipt for the items that the police were taking. Mot. Hr'g 116, 126-127. Upon reading it, Storm spontaneously stated that the thumb drive identified in the receipt (a Geek Squad thumb drive) was not his property but belonged to his girlfriend (Anderton) and that his device was a black Lexar thumb drive located in his blue bag in his bedroom. *Id.* at 117-118. The police officers then found and seized that additional thumb drive, added its description to the property receipt, told Storm that he was not under arrest, and left around 2:00 a.m. *Id.* at 118-

OPINION AND ORDER – PAGE 4

120; Def. Ex. 16 at 5-6.

In total, Detective Snider seized four items from Storm's house: one Geek Squad thumb drive, one white Apple MacBook laptop, one black Lexar thumb drive, and one brown cardboard jewelry box.  The MacBook and the two thumb drives were sent to the Northwest Regional Computer Forensics Lab (NWRCFL) to be examined by Oregon State Police Detective Kent Stuart. On August 24, 2010, Snider and Stuart met to review the evidence.  Detective Stuart had found multiple images of apparent child pornography on the MacBook and the Geek Squad thumb drive.  He had found no data of evidentiary value on the Lexar thumb drive.

On August 27, 2010, Storm was indicted by an Oregon state grand jury, charging thirty counts of Encouraging Child Sexual Abuse in the First Degree.  Trial commenced on September 13, 2011, in Multnomah County Circuit Court. After the parties' opening statements and the testimony of several witnesses, the State rested its case on Thursday, September 15, 2011. Storm then moved for acquittal for failure to establish venue under state law.  The State requested and was granted additional time to research and respond to the motion.  Over the weekend, "[d]ue to the arguable inability by the state to establish venue," the State asked the U.S. Attorney's Office for the District of Oregon to prosecute Storm under federal law.  *See* Def. Ex. 2 (Doc. No. 26-2) (government emails).  Assistant U.S. Attorney Jane Shoemaker informed the state prosecutors that if the state court case were dismissed without prejudice before the court ruled on the motion to dismiss, the U.S. Department of Justice's "*Petite* Policy" would not be triggered, which would make it easier for the U.S. Attorney's Office to arrest and charge Storm immediately.  Def. Ex. 1 (Doc. No. 26-1) (email from Jane Shoemaker).

When the state trial resumed on Monday morning, the Deputy District Attorney informed the Court that the United States Attorney had agreed to prosecute the case and moved for the

indictment to be dismissed without prejudice.  Def. Ex. 4 (Doc. No. 26-4) at 2-3.  Both

Defendant and the State agreed that the charges should be dismissed with prejudice with regard

to the State proceedings because jeopardy had attached. *Id.* at 3-4.  Counsel for Defendant

acknowledged that under the dual sovereigns theory, "[i]f the federal government chooses to

prosecute Storm, they have that authority, probably." *Id.* at 5.  The state court then dismissed the

case without prejudice for federal prosecution but with prejudice with respect to State

prosecution.  Storm was immediately arrested by federal agents in the courtroom and was

subsequently indicted by a federal grand jury for knowing possession of child pornography.

  The State delivered custody of the evidence to Homeland Security Investigations ("HIS")

for the federal government to conduct its own examination.  On October 21, 2011, HSI Special

Agent Clifford Jones applied for federal warrants to search the MacBook and Geek Squad thumb

drive for evidence of knowing possession, access with intent to view, receipt, and possible

distribution of child pornography, as well as evidence of ownership or control of the devices

during the time periods during which the devices were allegedly used to commit these crimes in

order to "defeat any claim that the evidence was planted there by Anderton, Neilson, or another

third party." Def.'s Ex. 8a (Doc. No. 26-9) at 2, 13, 22; *see also* Def.'s Ex. 8 (Doc. No. 26-8).

This application for federal warrants was supported by an affidavit (Def.'s Ex. 8a) that

incorporated excerpts from Detective Snider's report detailing his interview with Anderton;

Neilsen's corroborating statements; statements made by Storm during the execution of the state

search warrant; and the child pornography previously found by the NWRCFL on the MacBook

and Geek Squad thumb drive.

  Two warrants were signed and issued by U.S. Magistrate Judge Acosta on the same day,

one for the MacBook and one for the Geek Squad thumb drive.  Each warrant described the item

to be searched, what to search for, what crime was suspected, and the search procedure to

employ.  Each warrant also permitted the examination of "all of the data contained in the

computer equipment and storage devices to view their precise contents and determine whether

the data falls within the items to be seized," as well as  attempts to recover "'deleted,' 'hidden' or

encrypted data."  Def.'s Ex. 9 (Doc. No. 26-10) at 7; Def.'s Ex. 10 (Doc. No. 26-11) at 7.

HSI's investigation of the MacBook and of the Geek Squad thumb drive identified

additional evidence not included in the NWRCFL investigation.  This evidence includes files that

had been deleted but remained in the devices' unallocated space, as well file pathways that

suggested that child pornography viewed on the MacBook had been stored on a Lexar thumb

drive. *See* Def.'s Ex. 11a (Doc. No. 26-13).  Based on this new evidence and the understanding

that the NWRCFL investigation had not examined the unallocated space on the two thumb drives

for deleted files, HIS applied for and received new federal warrants in January 2012 to search the

Lexar thumb drive, as well as mirror images of all three devices created by the NWRCFL to

verify the results of the investigation.

The warrants granted included substantially similar descriptions of the evidence to be

seized and the search procedures to be employed as the October 2011 warrants.  The government

alleges that the subsequent investigation found more child pornography in unallocated space on

the Lexar thumb drive and confirmed that the NWRCFL mirror images contained all the same

evidence.  Gov't Opp'n Def.'s Mot. Suppress Evidence from General Warrants (Doc. No. 42)

at 7–8 ("Gov't Opp'n General Warrants").

## DISCUSSION

## I.    Motion to Dismiss Indictment for Double Jeopardy

Defendant contends that the transfer of Storm's case to federal prosecutors constitutes a

"sham" and a "second bite at the apple," rather than an independent prosecution by a separate

sovereign, and therefore violates the Double Jeopardy Clause of the Fifth Amendment. Because the degree of collusion between the state and federal prosecutors is not sufficient reasonably to permit an inference that one sovereign had been "so thoroughly dominate[d]" by the other as to have had "little or no volition in its own proceedings," Defendant's motion is denied. *See United States v. Zone*, 403 F.3d 1101, 1105 (9th Cir. 2005).

The Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has "uniformly held that the States are separate sovereigns with respect to the Federal government," and "[w]hen a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" *Heath v. Alabama*, 474 U.S. 82, 88-89 (1985) (quoting *United States v. Lanza,* 260 U.S. 377, 382 (1922)). For this reason, successive prosecutions by state and federal authorities do not, in general, violate the Double Jeopardy Clause. *Id.*

The courts have recognized a narrow exception to this general rule, however. In *Bartkus v. Illinois*, 359 U.S. 121 (1959), the defendant had been acquitted in a federal trial but subsequently convicted for the same conduct in a state trial. *Id.* at 121–22. The Supreme Court acknowledged that the validity of this successive prosecution was "unquestioned," *id.* at 132, but suggested that had the state been "merely a tool of the federal authorities" and the state prosecution "a sham and a cover for a federal prosecution," the successive prosecution might violate the Double Jeopardy Clause. *Id.* at 124. The bar for triggering this exception is high. In *Bartkus*, the FBI gathered evidence for the state trial after the defendant's acquittal in federal court, and federal sentencing of accomplices was delayed until after they could testify in the state trial. Notwithstanding these facts, the Supreme Court held that this sort of cooperation was

"conventional practice between the two sets of prosecutors" and did not violate the defendant's Fifth Amendment rights. *Bartkus*, 359 U.S. at 123–24.

The Ninth Circuit explicitly recognized the exception suggested in *Bartkus*. *See Zone*, 403 F.3d at 1104. The Ninth Circuit also acknowledged that "it is extremely difficult and highly unusual to prove that a prosecution by one government is a tool, a sham or a cover for the other government." *United States v. Figueroa-Soto*, 938 F.2d 1015, 1019 (9th Cir. 1991). In *Figueroa-Soto*, the defendant was initially tried and convicted in state court for acts significantly overlapping with his later federal indictment. To circumvent the Speedy Trial Act and obtain time to conduct a sufficiently thorough investigation, federal agents requested that state authorities prosecute him first. *Id.* at 1017. "[E]verything that the DEA had was brought to the state agencies, all intelligence, all ledgers, documents, everything was brought to the state to assist in the prosecution." *Id.* (internal quotation marks omitted). In addition, federal agents worked under the supervision of county and state prosecutors. *Id.* Federal witnesses testified at the state trial, and a federal agent sat with the state prosecutor at the prosecution table. *Id.* The state prosecutor was then designated as a Special Assistant United States Attorney for the federal prosecution. *Id.* at 1019. Despite these and a number of other factors, the Ninth Circuit held that this "norm of cooperative effort" was "conventional practice" and did not violate the defendant's rights under the Fifth Amendment. *Id.* at 1020.

The burden of proving that a second proceeding is a sham lies with the defendant. *United States v. Koon*, 34 F.3d 1416, 1439 (9th Cir. 1994). Although no Ninth Circuit case has ever held that a successive prosecution by a separate sovereign violated the Fifth Amendment,[1] the

---

[1] The government points out that neither they nor defendant were able to cite *any* cases finding a successive prosecution by a separate sovereign to be a sham, despite many attempts by defendants to assert such a claim. Gov't's Opp'n Def.'s Mot. Dismiss at 6 ("Gov't Opp'n

Ninth Circuit has set forth certain standards, in addition to the language in *Bartkus*, under which

such a finding could be made. "[T]he Double Jeopardy Clause limits consecutive state and

federal criminal proceedings only when federal prosecutors 'so thoroughly dominate[ ] or

manipulate[ ] the [state's] prosecutorial machinery . . . that the latter retains little or no volition in

its own proceedings.'"[2]  *Zone*, 403 F.3d at 1105 (quoting *United States v. Guzman,* 85 F.3d 823,

827 (1st Cir. 1996)). "[S]ufficient independent federal involvement would save [federal]

prosecutions from [the *Bartkus*] exception."  *United States v. Bernhardt*, 831 F.2d 181, 183 (9th

Cir. 1987).

     The parties are in substantial agreement about the facts.  There was certainly some degree

of cooperation between federal and state authorities.  Federal and state prosecutors coordinated

to ensure that the state prosecution was dismissed without prejudice for federal prosecution, so as

not to trigger the Department of Justice's *Petite* Policy, which would require that an Assistant

Attorney General approve the federal prosecution.  In addition, two federal agents testified at the

state proceeding.  The federal prosecution also relied on the results of the state search for the first

set of federal search warrants.  Further, the federal prosecution had the benefit of hearing the

defense's theory of the case in the state trial and specifically sought evidence to counter that

theory.

     This degree of cooperation, however, is not even as close as that described in *Bartkus* or

*Figueroa-Soto*, where no Double Jeopardy violation was found. *See Bartkus*, 359 U.S. at 123–

24; *Figueroa-Soto*, 938 F.2d at 1017.  Furthermore, the federal prosecution conducted a separate

_____

Double Jeopardy").

    [2] In this case, defendant claims it is the *federal* prosecutorial machinery that is being
dominated.  *See* Def.'s Reply Gov't Opp'n Double Jeopardy at 2 ("the United States Attorney's
Office is continuing to act as a cover or agent for the Multnomah County District Attorney, in
essence to get a second bite at the apple").

forensic investigation of the seized items, which found evidence that the state forensic investigation did not recover. The federal government has developed new witnesses, conducted new interviews, and subpoenaed additional records. Gov't Opp'n Double Jeopardy at 5. This is "independent federal involvement" that is sufficient to save the federal prosecution from the *Bartkus* exception. *See Bernhardt*, 831 F.2d at 183.

Finally, Defendant argues that given the recent expansion of the scope of federal criminal law and the correspondingly greater overlap with state criminal law, the increased opportunity for federal and state prosecutors to collude in successive prosecutions justifies revisiting the narrowness of the *Bartkus* exception. This court is bound by the law of the circuit as represented by *Bernhardt* and *Figueroa-Soto*, which make clear the narrow scope of the *Bartkus* exception. The cooperative effort of the two sovereigns here was well within the norm. Accordingly, there was no violation of Defendant's right against Double Jeopardy, and Defendant's motion to dismiss is denied.

## II.    Motion to Suppress Defendant's Statements

Storm contends that his statements made during the execution of the state search warrant were obtained in violation of his *Miranda* rights, and therefore the "fruits" of those statements, specifically his laptop and two thumb drives, should be suppressed. Because Defendant's statement identifying his laptop was not actually coerced and because the warrant authorized the seizure of all computer evidence, the laptop and Geek Squad thumb drive need not be suppressed. *See United States v. Patane*, 542 U.S. 630, 636, 644 (2004); *Nix v. Williams*, 467 U.S. 431, 444 (1984). Because Defendant's statement regarding the location of his Lexar thumb drive was not in response to "express questioning" or its "functional equivalent," the Lexar thumb drive need not be suppressed. *See Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

Accordingly, Defendant's motion is denied.

Prosecutors may not use statements stemming from custodial interrogation unless the defendant has been advised of his right to remain silent and his right to have counsel present. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Interrogation includes "either express questioning or its functional equivalent," meaning "any words or actions on the part of the police (other than those *normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-301 (emphasis added). The Ninth Circuit has held, for example, that informing a suspect that agents had seized approximately 600 pounds of cocaine was not the functional equivalent of interrogation because it was a statement "normally attendant to arrest and custody" and did invite a response. *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (quoting *Innis*, 446 U.S. at 301).

Further, prosecutors may use the physical fruits of a statement obtained in violation of *Miranda* unless the statement was "actually coerced." *United States v. Patane*, 542 U.S. 630, 636, 644 (2004). "The test for determining whether a confession is voluntary is 'whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.'" *See United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998) (quoting *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990)). The exclusionary rule also does not apply to evidence that "ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444, 448.

The government does not contest that Storm properly invoked his *Miranda* rights. Gov't's Opp'n Def.'s Mot. Suppress Statements (Doc. No. 32) at 10 ("Gov't Opp'n Suppress"). The government also assumes without conceding that Storm was "in custody" during the

execution of the state search warrant.  Gov't Opp'n Suppress at 7-8.  According to Storm's testimony, Storm made two statements after having invoked his *Miranda* rights.

First, when asked by Detective Snider how long Storm had his thumb drive, Storm said that he had a black thumb drive with a see-through plastic cap that he had been using for about a year.  Mot. Suppress Def.'s Statements at 4.  This statement was made after Storm was given his *Miranda* warning and before he invoked his right not to speak.  *Id.* at 3-4.  Later, after Storm invoked his rights, Detective Snider asked Storm for help in distinguishing Storm's laptop from his son's computer.  Storm explained that his son's computer was a dull gray metal and that it was located in his son's bedroom.  *Id.*  The government does not address the admissibility of Storm's statements, but instead appears to assume, for purposes of the pending motion, that they were obtained in violation of Storm's *Miranda* rights; the government, however, contests the remedy sought by Storm.  Gov't Opp'n Suppress at 10-11.

*Patane* is clear that if a defendant's statement was not actually coerced, the physical fruit of such a statement need not be suppressed.  542 U.S. at 636.  Accordingly, Defendant urges that this statement was actually coerced considering the totality of the circumstances: the late hour, his "state of shock," the presence of a number of officers in his house, the imminent removal of his son, and the continuing questioning after he invoked his rights.  Mot. Suppress Def.'s Statements at 10-11.  The court finds that these circumstances do not demonstrate that Defendant's will was overborne. There was no physical or psychological coercion, the circumstances were not atypical for police procedures, and all parties acted calmly and civilly. *Cf. Fisher*, 137 F.3d at 1166.

Second, when Storm was shown the written property receipt, he spontaneously stated that the Geek Squad thumb drive described in the receipt belonged to his girlfriend and that his own

thumb drive was located in his backpack on the floor in his bedroom.  Showing Storm the property receipt was neither "express questioning" nor its "functional equivalent" because the police had no reason to know it would "elicit an incriminating response" from Storm.  *See Innis*, 446 U.S. at 301.

Third, the laptop and Geek Squad thumb drive are admissible under the inevitable discovery doctrine.  *See Nix*, 467 U.S. at 444.  The warrant accurately described Storm's laptop as white rather than metallic grey, it was in plain view on Storm's dresser, and the warrant authorized the seizure of all computer evidence.  The Geek Squad thumb drive was found directly underneath the laptop.  There is little question that the police would have found and seized both the laptop and Geek Squad thumb drive with or without Storm's statements.

For all of these reasons, Defendant's motion to suppress is denied.

## III.     Motion to Suppress Evidence Obtained from General Warrants

Defendant contends that both the state and federal search warrants were impermissibly general and that the proper remedy is total suppression of all evidence obtained pursuant to those warrants.  Because portions of the state warrant were sufficiently particular and the evidence seized was taken under those portions, and because the prevailing law in this circuit does not require a search protocol in the warrant to govern the examination of electronic storage media, Defendant's motion is denied.  *See United States v. Hay*, 231 F.3d 630, 636-37 (9th Cir. 2000) (upholding a warrant that "authorized the government to search and seize Hay's entire computer system"); *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 707 (9th Cir. 2009) (endorsing the severance doctrine when only portions of a warrant are invalid); *United States v. Giberson*, 527 F.3d 882, 889-90 (9th Cir. 2008) (rejecting the need for a search protocol).

### A.   Legal Standards

The Warrant Clause of the Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, . . . and *particularly* describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). The description in the warrant must be specific enough to guide the executing officer as to which items to search or seize.[3] *See Marron v. United States*, 275 U.S. 192, 196 (1927). The "manifest purpose of this particularity requirement" is to prevent "wide-ranging exploratory searches" by "limiting the authorization to search to the specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

The Ninth Circuit has developed the following three-factor test to determine whether a warrant is sufficiently precise:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant, (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*United States v. Vasquez*, 654 F.3d 880, 884 (9th Cir. 2011) (quoting *United States v. Stubbs*, 873 F.2d 210, 211 (9th Cir. 1989)); *see also United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) (describing similar factors). The level of specificity required depends on what is reasonable given "the circumstances of the case and the type of items involved." *Hill*, 459 F.3d at 973 (quoting *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)); *see also id.* at 974 ("As always under the Fourth Amendment, the standard is reasonableness.").

Where digital evidence is concerned, the Ninth Circuit has often upheld broad warrants to

---

[3] A police officer may, however, "seize evidence in plain view without a warrant," as long as "the initial intrusion that brings the police within plain view of such an article" is legal. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).

seize all storage media for later examination.  *See, e.g.*, *Hay*, 231 F.3d at 636-37 (upholding a warrant that "authorized the government to search and seize Hay's entire computer" because the government "had no way of knowing where the images were stored"); *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (allowing seizure of the defendant's "entire computer system"); *but see United States v. Kow,* 58 F.3d 423, 427 (9th Cir. 1995) (invalidating a warrant that "authorized the seizure of virtually every document and computer file" at the defendant's business).  Such warrants must be supported by affidavits "giving a reasonable explanation . . . as to why a wholesale seizure is necessary," enabling the magistrate to "intelligently . . . exercise the court's oversight function."  *Hill*, 459 F.3d at 976; *see also Lacy*, 119 F.3d at 746 (distinguishing *Kow* because "the affidavit [in *Lacy*] established probable cause to believe Lacy's entire computer system was likely to evidence criminal activity" (internal quotation marks omitted)).

   The Ninth Circuit has also declined to require warrants for digital storage media to specify a search protocol for the government to follow.  *See, e.g.*, *Giberson*, 527 F.3d at 889-90 (rejecting the argument that "a search of [the defendant's] computer files should have been limited to files likely to be associated with those identified in the search warrant"); *Hill*, 459 F.3d at 978 ("we look favorably upon the inclusion of a search protocol; but its absence is not fatal"); *United States v. Adjani*, 452 F.3d 1140, 1150 (9th Cir. 2006) (similar).  Such restrictions are unnecessary because even without them, "the officer is always limited by the longstanding principle that a duly issued warrant . . . may not be used to engage in a general, exploratory search."  *Hill*, 459 F.3d at 978 (internal quotation marks omitted).

   In support of his motion, Defendant relies heavily on *United States v. Comprehensive Drug Testing, Inc.* ("*CDT*"), 621 F.3d 1162 (9th Cir. 2010) (*en banc*), for the proposition that

warrants for searches of digital storage media must include numerous safeguards, including a search protocol, to satisfy the particularity requirement.  Mot. Suppress Evidence Obtained from General Warrants at 19, 21-25 ("Def's Mot. General Warrants").  The enumerated safeguards in *CDT* that are relied upon by Defendant, however, appear not in the majority opinion in *CDT*, but in Chief Judge Kozinski's concurrence.  *See CDT*, 621 F.3d at 1179 (Kozinski, C.J., concurring).  They are, therefore, not controlling law in this circuit.

When a warrant violates the Fourth Amendment, the exclusionary rule applies, which prohibits the use at trial of "evidence seized during an unlawful search."  *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  "[I]ndirect products" of an illegal search, such as "statements or physical evidence subsequently obtained in part as a result of the search," are also barred "if they bear a sufficiently close relationship to the underlying illegality."  *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) (internal quotation marks omitted).  When only portions of a warrant are insufficiently specific, however, the Ninth Circuit has "endorsed a doctrine of severance, which allows a court to strike from a warrant those portions that are invalid and preserve those portions that satisfy the [f]ourth [a]mendment."  *SDI Future Health, Inc.*, 568 F.3d at 707 (internal quotation marks omitted) (alterations in original).  On the other hand, "when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search," severance is not appropriate.  *Id.* at 707 (internal quotation marks omitted).

### B.    The State Search Warrant

The MacBook and the two thumb drives were seized under the portions of the state warrant authorizing seizure of "[a] white Macintosh laptop computer belonging to Mr. Logan Storm" and "[a]ny device capable of creating, storing, or viewing electronic date [sic], including without limitation computers, cellular telephones, personal data assistances, CDs and DVDs, and

other electronic storage media." Def.'s Ex. 7 at 10-11. The Ninth Circuit has consistently upheld broad seizure of digital storage media as long as the supporting affidavit explains why wholesale seizure is necessary. *See Hill*, 459 F.3d at 976. The affidavit in support of the state warrant provides a sufficient explanation. *See* Def.'s Ex. 7 at 6-7.

Storm argues that in this case, because the witnesses identified two particular devices containing child pornography, the warrant should have been limited to those two devices. Def.'s Reply Gov't Opp'n General Warrants at 2, 5-7. He cites *Lacy* and *Hay* for this proposition. Those cases, however, authorize broad seizure when the material sought may be anywhere in the suspect's computer equipment; they provide little guidance for cases like this one where the location is known for some, but not necessarily all, of the contraband. *See, e.g.*, *Hay*, 231 F.3d at 637 (upholding broad seizure because "[t]he government . . . had no way of knowing where the images were stored"). Computer files are easy to transfer, copy, and delete from device to device. Although the witnesses found some contraband, there was no reason to assume that they had found it all,[4] especially as they lacked the training and experience of the affiant in investigating child pornography cases involving the internet. Much like *Hay*, the government here had probable cause to search for child pornography on Defendant's digital storage media and did not know where every file containing child pornography was stored; therefore, the broad seizure of digital storage media satisfies the Ninth Circuit's test for particularity in a search warrant. *See* 231 F.3d at 637.

Storm also argues that the lack of a search protocol for the seized devices renders the warrants unconstitutionally broad. Specifically, he argues that the warrants should have restricted the search to "recently viewed files," where Anderton had told the police that she saw

---

[4] In fact, they had not. *See* Gov. Opp. General Warrants at 7–8 (finding more child pornography on the Lexar thumb drive).

images of child pornography.  This conclusion is unsupported by case law.  The Ninth Circuit "look[s] favorably upon the inclusion of a search protocol" but does not require it.  *See Hill*, 459 F.3d at 978. Additionally, the warrants authorize a search for and seizure of "[e]vidence of communications related to the sexual exploitation of children," "[e]vidence of creation, storage, and transfer of illicit images," and "[a]ny and all documentation regarding the abuse of children such as, but not limited to, videos, recordings, photographs, drawings, and/or written words," all of which are sufficiently particular and for which there was probable cause.  The investigators could reasonably conclude that such evidence would not be located solely within the "recently viewed files" on Defendant's MacBook.

Several portions of the state warrant, however, may be impermissibly general.  For example, the warrant authorizes seizure of  "[d]ocumentation to establish identification such as, but limited to [sic], letters, bills, rent receipts, checks, driver's licenses or identification, tax records, personal bank or credit card records, credit cards, utility bills, notes, and/or letters;" "[a]ny and all documentation regarding the abuse of children such as, but not limited to, videos, recordings, photographs, drawings, and/or written words;" and "[e]vidence of communications related to the sexual exploitation of children."  Def.'s Ex. 7 at 10-11.  The court concludes, however, that at least the remaining five of the eight provisions in the state search warrant are sufficiently particular to pass constitutional muster.  The MacBook and the two thumb drives were seized under those provisions.  The valid portions of this warrant are not "a relatively insignificant part of an otherwise invalid search," and therefore the severance doctrine is appropriate.  *See SDI Future Health, Inc.*, 568 F.3d 707 (internal quotation marks omitted). Even if the court were to strike down three of the eight provisions, the court upholds the remaining five provisions of the state warrant.  The MacBook and the two thumb drives, seized

pursuant to the constitutionally-valid  provisions of the state search warrant are not suppressed.

In addition, a brown cardboard jewelry box was also seized during the execution of the state warrant.[5]  It was found on Storm's dresser underneath his laptop. Anderton had previously described it to Detective Snider as the location of the thumb drive on which she had found additional images of child pornography.   Although the box does not fall within one of the five remaining provisions of the state warrant, the warrant authorized the police presence in the house and the box was therefore legally seized under the plain view exception to the warrant requirement.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).

### C.       The Federal Search Warrants

Storm argues that evidence found pursuant to the federal search warrants should be suppressed because they are "tainted" by reliance on the state search warrants.  Because the items were lawfully seized pursuant to the valid portions of the state warrant (or under the plain view exception, in the case of the jewelry box), there is no taint.  Storm also argues that the federal search warrants were independently impermissibly general because they did not incorporate the limiting framework outlined in *CDT*, 621 F.3d at 1179 (Kozinski, C.J., concurring).  As noted above, however, that framework is not controlling law in this circuit.  *See Hill*, 459 F.3d at 978.

Finally, Storm argues that this case is unique because "the government already knew what files and with which hash values were on the computer and digital media because the FBI-certified staff at NWRCFL had already searched the media," and therefore the federal search warrants should have been limited to those files and locations.  Def.'s Mot. General Warrants at 23.  The government responds that a broader search was necessary to find evidence "showing

---

[5] Defendant has not specifically argued to suppress this box, but he does move for total suppression.  Def.'s Mot. General at 27.

defendant's ownership and control of the devices, as well as his *knowing* possession of child pornography on each, and whether he received, distributed, or possibly produced, any child pornography." Gov. Opp. General Warrants at 19 (emphasis in original). Merely confirming the existence of the previously discovered child pornography would be insufficient for such an investigation. In addition, the federal authorities, pursuing their own independent investigation, would be entitled to conduct their own search of Defendant's electronic media for contraband that they had probable cause to believe would be located on that media.

Probable cause for the federal search warrants was established by the state investigation conducted before the state search warrant was issued, by the execution of the state search warrant, and by examination of the seized digital storage media. The search protocol in the federal warrants is almost identical to that approved in *Adjani*. *Compare* 452 F.3d 1140, 1144 (9th Cir. 2006) ("In searching the data, the computer personnel will examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein." (quoting the search warrant)) *with* Def.'s Ex. 9 at 7 (containing identical language). Finally, the federal search warrants expressly state both the criminal conduct suspected and the relevant statutes, and the federal search warrants were sufficiently particular. Accordingly, the federal search was lawful, and Defendant's motion to suppress is denied.

**IV.    Motion to Suppress and for a *Franks* Hearing**

Storm contends that the HSI agent who applied for the federal search warrants intentionally or recklessly made false statements or omissions that were necessary for a finding of probable cause by the U.S. Magistrate Judge. Because Storm has made no substantial showing as to this claim, both his motion to suppress and his motion for a *Franks* hearing are

OPINION AND ORDER – PAGE 21

denied.  *See Franks v. Delaware*, 438 U.S. 154, 155–56, 171 (1978).

In *Franks*, the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  *Id.* at 155-56.

There is a "a presumption of validity" for information in an affidavit in support of a warrant.  *Id.* at 171.  The defendant's allegations to the contrary must be "more than conclusory," and "accompanied by an offer of proof" such as "[a]ffidavits or sworn or otherwise reliable statements of witnesses."  *Id.*  "Allegations of negligence or innocent mistake" are not sufficient to sustain a *Franks* motion; the defendant must show "deliberate falsehood or . . . reckless disregard for the truth."  *Id.*  The Ninth Circuit has held that a "lack of an affidavit or sworn statement offering proof of deliberate falsehood . . . is enough in itself to defeat [a] demand for an evidentiary hearing."  *United States v. Ruddell*, 71 F.3d 331, 334 (9th Cir. 1995).  The standard for falsehoods omitted is the same as for falsehoods included.  *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004).  Even assuming such evidence is provided, if after striking the false portions of the affidavit, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  *Franks*, 438 U.S. at 171.

The Ninth Circuit has distilled these requirements into the following five-element test:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. DiCesare*, 765 F.2d 890, 894–95 (9th Cir. 1985), *amended by* 777 F.2d 543 (1985).

Before reaching Defendant's arguments, the court makes two preliminary observations. First, Storm has submitted no affidavit offering proof of *deliberate* falsehood or *reckless* disregard for the truth, which omission under Ninth Circuit precedent is sufficient by itself to deny a *Franks* motion. *See Ruddell*, 71 F.3d at 334. Second, as the government points out, "any evidence regarding receipt, distribution, or production of child pornography would also be relevant evidence of knowing possession of child pornography." Gov't Opp'n Def.'s Mot. Suppress & Req. for *Franks* Hrg. (Doc. No. 33) at 16 n.6 ("Gov't Opp'n *Franks* Hrg."). Thus, establishing probable cause for knowing possession of child pornography would be sufficient to sustain each federal warrant.

Storm makes four separate arguments, three in his motion and one more in his reply. First, he alleges that the federal warrant applications failed to disclose that the NWRCFL agent "concluded there was no evidence of receipt of transfer of child pornography." Def.'s Mot. Suppress & Req. for *Franks* Hrg. (Doc. No. 24) at 2 ("Def.'s Mot. *Franks* Hrg."). Second, he alleges that the January 2012 federal warrant application "failed to disclose that no evidence of receipt, transfer, or manufacturing of child pornography was located pursuant to the federal agents' October 2011 searches." *Id.* at 3. Third, he alleges that both applications for federal search warrants "misrepresented the extent of the underlying state court proceedings" by not disclosing that the state case went to trial and foundered on a lack of venue. *Id.* Finally, he alleges that the state warrant application failed to include the "very specific description" provided by Anderton of the thumb drive containing child pornography. Def.'s Reply Gov't Opp'n *Franks* Mot. (Doc. No. 41) at 2.

OPINION AND ORDER – PAGE 23

Starting with the first allegation, Storm contends that "the government withheld from the issuing magistrate the fact that [Detective Stuart of the NWRCFL] searched the very same MacBook hard drive and found no evidence of downloading or sharing of files of child pornography." Def.'s Mot. *Franks* Hrg. at 5, 7. Storm cites to the following state trial testimony of Detective Stuart:

> Q:   Is it your experience that you might find individual images that have been deleted, artifacts of those images?
>
> A:   That does happen, yes.
>
> Q:   And in this case, *you looked for deleted images* on the hard drive.
>
> A:   I did, yes.
> Q:   And you didn't find anything.
>
> A:   No.
>
> Q:   And *did you find any evidence of file sharing* by the user of this computer for pornographic images?
>
> A:   No, I didn't.
>
> Q:   And had the user been file sharing to download hundreds of child pornography images and then deleting them, would you have expected to find some artifacts of those images?
>
> A:   Yes.

Def.'s Ex. 17 at 39 (emphasis added).

This testimony does not establish the facts alleged by Defendant. Detective Stuart only stated that he did not find "evidence of file sharing" or "deleted images." It cannot properly be inferred from this testimony that the Detective "concluded" that "evidence of downloading or transfer of images" "did not exist." *See* Def.'s Mot. *Franks* Hrg. at 5. As the government points out, "[f]ile sharing, also known as peer-to-peer or P2P sharing, is only one method to receive or distribute child pornography. . . . [D]efendant could have downloaded images from the child

pornography websites he visited, and he could have distributed child pornography simply by emailing images to another person."  Gov't Opp'n *Franks* Hrg. at 13.  Further, the fact that Detective Stuart had found images of child pornography is sufficient by itself to establish probable cause for knowing possession of child pornography.  Thus, any omission of the kind alleged by Defendant would not affect the probable cause for the warrant as a whole.

Second, Storm contends that by January 2012, "federal agents themselves had already searched for evidence of downloading, transfer, receipt or manufacture of child pornography pursuant to the October 2011 warrants and found none," and that this fact should have been disclosed in the second round of warrant applications.   Def.'s Mot. *Franks* Hrg. at 7-8.  The court does not agree. The HSI agent in fact had uncovered further evidence of "internet web browsing conducted by an individual with a sexual interest in children."  Def.'s Ex. 11a at 15. Further, the HSI agent had discovered that some of the child pornography found by the state investigation had been produced outside the State of Oregon.  Def.'s Ex. 11a at 12.  These facts indicate that the child pornography had been downloaded.  The HSI agent also found evidence that child pornography had been accessed on the Lexar thumb drive.  Def.'s Ex. 11a at 16.  These facts alone are sufficient to establish probable cause to search the Lexar thumb drive for evidence of knowing possession as well as the possibility of receipt, distribution, or manufacture of child pornography.  In addition, it was clear that HSI had not finished its examination of the devices, *see* Def.'s Ex. 11a at 15, so any statement that the investigation had definitively not found evidence would have been premature.  There is also no evidence that any omission in this regard was deliberate or reckless, particularly given that the affidavit explicitly noted that the state investigation had uncovered "no data of evidentiary value" on the Lexar thumb drive. Def.'s Ex. 11a at 13-14.

Third, Storm contends that the federal warrant applications did not disclose the "exceptional" procedural posture of the case. He argues that the failure to disclose the fact that the federal prosecution was commenced only after the State ran into problems of proving venue at trial could have misled the magistrate. Although it is true that the affidavits did not disclose the fact of the state trial or the dismissal of state charges, the lack of venue under state law is not relevant to probable cause for a federal statute that has no venue element. Defendant appears to rely solely on *CDT*, which held that the government "must fully disclose to each judicial officer prior efforts in other judicial fora to obtain the same or related information." 621 F.3d at 1175. In *CDT*, however, the government had issued subpoenas and applied for search warrants in three separate districts without informing the judicial officers of each district of the efforts taken in the other districts. *Id.* at 1166. Here, the government *did* disclose in the affidavit the "prior effort[] in [an]other judicial for[um]" to obtain the same information. *See, e.g.*, Def.'s Ex. 11a at 8-13 (detailing the execution of the state warrant and results thereof).

Finally, Storm argues that Detective Snider also intentionally misled the state judge by not including the specific description of the thumb drive on which Anderton had found the child pornography and reported to the police. Def.'s Reply Gov't Opp'n *Franks* Hrg. at 2. Storm claims that, because Anderton found child pornography on the thumb drive with the red emblem, there was no probable cause to seize the other (Lexar) thumb drive. As discussed previously, Ninth Circuit case law allows for broad seizure of computer media in cases like this one because of the nature of digital storage. Therefore, even if Detective Snider had included a more precise description of the thumb drive, there would have been probable cause to authorize the seizure of additional thumb drives.

OPINION AND ORDER – PAGE 26

Storm has not met his burden of the substantial evidentiary showing required for a *Franks* motion. Defendant's motions to suppress and for a *Franks* hearing are denied.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Defendant's Statements (Doc. No. 22) is DENIED, Defendant's Motion to Dismiss Indictment for Violation of Double Jeopardy Clause (Doc. No. 23) is DENIED, Defendant's Motion to Suppress and for a *Franks* Hearing (Doc. No. 24) is DENIED, and Defendant's Motion to Suppress Evidence Obtained from General Warrants (Doc. No. 25) is DENIED.

Dated this 23rd day of August, 2012

/s/ Michael H. Simon
Michael H. Simon
United States District Judge